**HOUSTON CHRONICLE PUB. CO. v. MARTIN.**

No. 4040.

Court of Civil Appeals of Texas. Amarillo.

Oct. 18, 1933.

Rehearing Denied Nov. 22, 1933.

Blanchard & Woodul, Huggins, Kayser & Liddell, and Jacob F. Wolters, all of Houston, and Birkhead, Beckmann, Stanard & Vance, of San Antonio, for appellant.

J. W. Ragsdale, of Victoria, and Edwin Sehorn, of San Antonio, for appellee.

JACKSON, Justice.

The appellee instituted this suit in the district court of Bexar county against appellant to recover damages alleged to have been sustained by him on account of the publication by appellant of two articles in the Houston Chronicle disparaging the quality and purity of forty-three head of Brahma bulls imported by appellee from Brazil for sale on the market for breeding purposes.

The articles appeared in the first and final editions of the paper on September 27, 1924, gave a brief history of the hoof and mouth disease, its discovery in Harris county, the quarantine established, etc. A copy of each of the two articles is attached to and made a part of appellee's petition. The article in the first edition among other things, contained this statement: "The source of the present infection in this country has not been established definitely, but it is believed to have originated in the shipment to the Nellore of seven Brahma bulls from Mexico. The bulls belonged to a herd imported from Brazil about a year ago by John Martin of Artesia Wells, near San Antonio."

This statement also appeared in the final edition, together with this additional paragraph: "One of the Brahma bulls which was imported from Mexico and which is believed was in the same herd that brought the infection into Harris County has been located on the McFadden ranch in Victoria County, it was learned Saturday."

Appellee claims that by reason of said publications, the market value of these forty-three bulls was diminished to the extent of $38,356, and he was, in addition thereto, compelled to expend $6,514.60 for their feed and care.

In an opinion by the Court of Civil Appeals at El Paso on a former appeal of this case, will be found a complete statement of the allegations in appellee's petition on which he relies for recovery. Houston Chronicle Publishing Company v. Martin (Tex. Civ. App.) 5 S.W.(2d) 170.

The appellant answered by general demurrer, special exceptions, and general denial, and specially pleaded that the publications were made in good faith, were without malice, and under the facts and circumstances were privileged. That if appellee suffered any damage, it was not caused by the publication of said articles, but was occasioned by other independent agencies.

In response to special issues, the jury found, in substance, that the articles published by appellant on September 27, 1924, were false in so far as they charged that the bulls imported by appellee were the cause of the outbreak of the hoof and mouth disease in Harris county; that the appellant did not act in good faith, but was prompted by actual malice toward appellee in the publication of the articles; and that such publications were the proximate cause of damages to appellee in the sum of $14,000. On these findings judgment was rendered that appellee have and recover of and from the appellant said sum, with interest thereon from July 30, 1932, from which judgment this appeal is prosecuted.

The appellant, by numerous assignments, assails the action of the court in overruling its general demurrer and refusing to direct a verdict in its behalf on the claim of diminished market value, because the defamatory words published were not in themselves actionable, as they do not reflect on appellee personally, and, in order to recover, he was required to allege and prove special damages, such as the loss of particular sales, and, having pleaded only a decline in the market value, which is general damages, could not recover therefor.

In support of these assignments, the appellant relies on numerous text-writers and decisions cited below which support its position. 27 Tex. Jur. p. 693 § 54; Newell, Slander & Libel (4th Ed.) 844, 200, 842, 843; 37 C. J. 136; 36 C. J. 1230; Burkett v. Grif-

fith, 90 Cal. 532, 27 P. 527, 13 L. R. A. 707, 25 Am. St. Rep. 151; Wilson v. DuBois, 35 Minn. 471, 29 N. W. 68, 59 Am. Rep. 335; Swan v. Tappan, 5 Cush. (59 Mass.) 104; Marlin Firearms Co. v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310; Hill v. Ward, 13 Ala. 310; Ebersole v. Fields, 181 Ala. 421, 62 So. 73; Griffin v. Isbell, 17 Ala. 186; Hubbard v. Scott, 85 Or. 1, 166 P. 33; Barquin v. Hall Oil Co., 28 Wyo. 164, 201 P. 352, 202 P. 1107; Stevenson v. Love (C. C.) 106 F. 466; Harriss et ux. v. Sneeden et al., 101 N. C. 273, 7 S. E. 801, 804; Farmers' State Bank v. Hintz, 206 Iowa, 911, 221 N. W. 540; Womack v. McDonald, 219 Ala. 75, 121 So. 57; Briggs v. Coykendall, 57 N. D. 785, 224 N. W. 202; Seeck & Kade v. Pertussin Chem. Co., 235 App. Div. 251, 256 N. Y. S. 567; 17 R. C. L. 456: National Refining Co. v. Benzo Gas Motor Fuel Co. (C. C. A.) 20 F.(2d) 763, 55 A. L. R. 406.

■ Were we confronted with these contentions as original propositions before an appellate court of this state for the first time, we would be very much inclined to sustain them. However, all these assignments were presented to and passed on adversely to appellant by the Court of Civil Appeals at El Paso in the opinion on the former appeal, supra. On the disposition of these questions in the previous appeal, appellee's cause of action depended and the Supreme Court having refused to review the holding of the Court of Civil Appeals at El Paso by dismissing an application for a writ of error, we feel impelled to follow the law as announced in the former decision and overrule these assignments.

■■ The appellant, by numerous· propositions which we consider together, presents as error the action of the trial court in refusing its requested peremptory charge and submitting to the jury the amount of damages appellee sustained by reason of the publication of said articles and rendering judgment for the amount of damages found by the jury, because the evidence shows that appellee's damages were, in any event, caused in part by agencies other than and independent of said articles, and the testimony fails to show what proportion, if any, of the damages resulted from such publications, and the findings of the jury on the amount of damages caused by appellant is without evidence to support it and so speculative and conjectural that no valid judgment can be rendered thereon.

The record shows that appellee shipped from Brazil into Mexico a herd of eighty-six Brahma bulls in 1923. From Mexico, during 1924, he imported into Texas in March twenty-nine head of the herd, in July he imported an additional twenty-nine, and the remainder he imported in September. He reserved two for his use. Of the March importation he sold twenty-three, of the July importation thirteen, and of the September importation five.

These sales were made prior to September 27, 1924, the date of the publication of the articles of which complaint is made.

During the year 1925 appellee sold seven of the animals in March and four in May. In April, 1927, he sold four and the remainder of the forty-three on hand at the date of the publication of the articles he disposed of by June, 1927.

Dr. Jacobs purchased seven of the animals on March 30, 1924, placed them on his ranch in Harris county, and about September 12th thereafter a disease tentatively pronounced the hoof and mouth disease appeared among the cattle on said ranch and the Brahma bulls were suspected of being the source of the disease. The officers of the live stock sanitary commission of Texas, the officers of the Bureau of Animal Industry in the Department of Agriculture of the United States, and the officers of the Texas & Southwest Cattle Raisers Association were notified, and they, together with several Harris county citizens and a number of the leading cattlemen of the state to whom the circumstances had been reported, met in Houston and held a public meeting in the courthouse where there was a general discussion of the hoof and mouth disease, the danger, the location, and the probable source thereof, and a quarantine of the territory considered infected was ordered. This meeting occurred on the date the two articles appeared in the first and final editions of the Houston Chronicle. On the same day the San Antonio Evening News, with a circulation exceeding 31,000 copies, published an article announcing, in substance, that because of the discovery of the hoof and mouth disease on the ranches of Dr. Jacobs and Tom C. Dunn, Jr., a quarantine had been established in Harris and Galveston and parts of Brazoria and Fort Bend counties, nearly 1,200 blooded cattle ordered slain and forty-two United States inspectors had been assigned to enforce the quarantine regulations and fourteen federal inspectors who were in the California outbreak of the hoof and mouth disease were on their way to Houston and that Louisiana had barred Texas live stock. We quote from the article in the San Antonio Evening News as follows:

"Dr. Jacobs first noticed a disease among his cattle several days ago. He immediately notified authorities, who conducted a secret investigation. Jacobs has a herd of 450 Brahmas, it is said. He values them at $76,000.00.

"The infection apparently spread from the ranch of Dr. Jacobs to Dunn's herd, separated only by a railroad track. Dunn also has a fine herd, but no estimate of his loss has been made.

"The disease may have originated, Dr. Jacobs believes, through his importation of a bull from South America recently."

It was also shown that for the purpose of stamping out the disease, approximately 10,000 head of cattle were slaughtered, the disease and the quarantine depressed the cattle business, affected the market value of all cattle, including the animals belonging to appellee, and during the quarantine which was not raised until March, 1925, there were few sales of any kind, class, or breed of cattle. That another herd of 67 head of Brahma bulls were being held in Mexico to be imported into Texas when the quarantine was raised and they were imported and placed on Dr. Jacobs' ranch in July, 1925, and this importation tended to flood the market. A second outbreak of the hoof and mouth disease appeared on said ranch within a week after this 67 head were placed thereon. In the second epidemic there were practically twice as many cattle slaughtered as in the first. There was an unusual freeze in December, 1924, causing the death of a greater per cent. of Brahmas than of other breeds of cattle and this induced many cattlemen to believe that the Brahmas were not as well inured to the hardships of a severe climate as other breeds. That due to these various causes, the cattlemen throughout Southwest and Southeast Texas did not desire to buy any cattle and those who had bought were trying to cancel their contracts. That these different factors or agencies each contributed to the decline in the market value of all cattle, high-priced bulls and cows, including the animals belonging to appellee.

The court took cognizance of the rule that appellee was not entitled to recover from appellant any damages caused by these other independent agencies, and instructed the jury in connection with the issue on damages as follows: "In this connection you are instructed that in estimating the damages, if any, you may consider the loss, if any, in the market value for special breeding purposes of the plaintiff, John T. Martin's bulls proximately caused solely by the publication of the articles in question and also the reasonable cost, if any, to the plaintiff John T. Martin, of keeping said bulls proximately caused solely by the publication of the articles in question. And you will not include in the estimate such damages, if any, as may have been contributed or may have resulted from other causes than the publication of the articles in question."

Appellee in his brief says that the appellant contends that the verdict of the jury was pure conjecture, but "it is to be observed, however, that the jury, while finding the issues in appellee's favor, nevertheless must have given some heed to appellant's theories, because the undisputed evidence shows that Martin's loss was $44,870.60" and "the verdict was for only $14,000.00."

The charge of the court and the finding of the jury emphasize the conjectural nature of the amount of damages found against appellant for the publication of the two articles, for the reason that the testimony is wholly insufficient to show the portion of the damages resulting from such publications and the part thereof caused by any or all of the other independent agencies.

"Where it appears that only a part of the damage suffered by the plaintiff was the result of the act complained of, a judgment is not sustainable in the absence of evidence showing what part of the damage is attributable to such act." 13 Tex. Jur. p. 369.

This announcement of the rule is in accord with the holding of the Supreme Court in Texas & P. Ry. Co. v. Dunn (Tex. Sup.) 17 S. W. 822, and the Courts of Civil Appeals in D. H. Fleming & Son v. Pullen (Tex. Civ. App.) 97 S. W. 109, and Currie et al. v. Trammell (Tex. Civ. App.) 289 S. W. 736, writ refused.

See, also, Knowlton v. C. & N. W. Ry. Co., 115 Minn. 71, 131 N. W. 858; Darnall v. Georgia Ry. & Elec. Co., 134 Ga. 656, 68 S. E. 584; Seely v. Alden, 61 Pa. 302, 100 Am. Dec. 642.

"Since it is a rule that the defendant is liable only to the extent to which his acts have caused the injury complained of, it follows that consecutive wrongs done by independent agents cannot be joined together to increase the responsibility of one of the wrongdoers. This rule applies notwithstanding any difficulty there may be in determining what part of the injury or loss was the result of the acts or omissions of the defendant, and what the result of other causes." 8 R. C. L. pp. 435, 436.

"Where there is evidence as to damages from various causes, as to a portion of which defendant cannot be held responsible, and no evidence as to the portion of the damage resulting from the separate causes, the proof is too uncertain to permit the jury arbitrarily to apportion a part or all of the proved damages to the acts for which defendant is responsible." 17 C. J. pp. 758, 759.

"The originator of the slander is only liable for such damages as is the direct and natural result of his act and he is not liable for subsequent repetition or publication of those words by another without his direction or authority." 37 C. J. p. 136. See, also, 36 C. J. p. 1230.

From the record in this case, it is obvious that only a part of the damages sustained by appellee resulted from the publication of the two articles by appellant, and, since the evidence was wholly insufficient to show what portion of the damages was attributable to

such other causes and what portion thereof resulted from the publication of the articles, the jury was without testimony from which they could estimate the damages caused by appellant.

We therefore sustain appellant's contention that the amount found by the jury is too speculative and conjectural to authorize a judgment against appellant therefor.

The assignments not disposed of by the foregoing discussion, as presented, do not constitute reversible error and are overruled.

The judgment is reversed and the cause remanded.